UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/23/2025___
```

-------------------------------------------------------------------X

JOHN ADRIAN TORRES,                          :
                                             :
                      Plaintiff,             :
                                             :
           -v-                               :           24-cv-05323 (LJL)
                                             :
                                             :           OPINION AND ORDER
UNIVERSAL MUSIC GROUP N.V. and UNIVERSAL     :
CITY STUDIOS L.L.C.,                         :
                                             :
                      Defendants.            :
                                             X
-------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

    Plaintiff John Adrian Torres ("Plaintiff") brings suit against Defendants Universal Music

Group N.V. ("UMG") and Universal City Studios LLC ("UCS," and together, "Defendants") for

(i) breach of contract under New York law, and (ii) "reverse domain hijacking" in violation of

Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), 15 U.S.C.

§ 114(2)(D)(v).  Dkt. No. 1.

    Defendants move to dismiss Plaintiff's claims as fraud on the Court pursuant to this

Court's inherent power and for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  Dkt. No. 33.

    Plaintiff moves under Rule 56(d) for denial or deferral of adjudication on Defendants'

motion to dismiss pending the opportunity for Plaintiff to take discovery.  Dkt. No. 60.

    Construing Defendants' motion as one for dismissal or, in the alternative, for a hearing at

which the Court will conduct an independent investigation into fraud on the Court, the Court

denies the motion for dismissal without prejudice but grants the motion for a hearing.  The Court

denies Defendants' motion to dismiss for failure to state a claim and Plaintiff's Rule 56(d)

motion without prejudice pending the Court's determination whether fraud has been committed.

# BACKGROUND

## I.    Plaintiff's Allegations

Plaintiff's Complaint ("Complaint" or "Compl."), Dkt. No. 1, tells a seemingly extraordinarily tale.

Plaintiff alleges that in 2003 he acquired the domain "universalmusicgroup.com" (the "Domain Name") "and developed it into a groundbreaking website that facilitated the digital transition of the company previously known as 'Universal Records' into online music video streaming." Compl. ¶ 7. At that time, due to privacy concerns and "to avoid being targeted," Plaintiff did not change the WHOIS record[1] to reflect his ownership when he acquired the domain. *Id.* ¶ 10. Plaintiff claims to be the rightful owner of the domain. *Id.* ¶ 30.

Plaintiff claims to have "invested substantial time, resources, and effort into developing and marketing the universalmusicgroup.com website." *Id.* ¶ 8. He further claims that "[t]hrough his visionary and substantially exclusive commercial use" of the domain beginning in 2003, "combined with extensive advertising and marketing efforts centered around the 'fasten your seatbelts as we blast off into a digital galaxy of music and sound' concept, [he] deliberately created an entirely new, source-identifying meaning and consumer association between 'Universal Music Group' and Plaintiff's innovative digital music platform among a vast number of digital music consumers over years of aggressive promotion and rapid commercial success in that space." *Id.* ¶ 11.

---

[1] WHOIS is a query and response protocol that is used for querying databases to determine the registered owners or assignees of a domain name. *See* Dkt. No. 52 at 6 n.4.

Plaintiff's ownership and "pioneering development" of the domain was "corroborated" by "a contractual agreement entitling Plaintiff to a 2% equity stake in the company, now valued at over one billion dollars." *Id.* ¶ 9.

According to Plaintiff, he enjoyed undisturbed ownership of the domain until Defendants initiated a proceeding under the Uniform Domain-Name Dispute-Resolution Policy ("UDRP") process "against Plaintiff's domain name," making allegations of fraud and fabrication of evidence "in retaliation for Plaintiff's refusal to accept an outrageously low settlement offer that grossly undervalues Plaintiff's equity stake and development work." *Id.* ¶ 18. Defendants "deliberately misled the UDRP by failing to disclose a recent court loss in a trademark dispute involving the UNIVERSAL REPUBLIC mark," *id.* ¶ 19, and "engaged in a pattern of deceptive tactics to mislead the UDRP panel, including misrepresenting facts, selectively presenting information, making unsupported claims of prior use, and attempting to manufacture evidence of bad faith through 'trap' emails or communications," *id.* ¶ 20. Defendants "attempted to reverse hijack the domain name" and "failed to engage in good faith negotiations to resolve the dispute amicably before filing a complaint" under the UDRP. *Id.* ¶ 22. Defendants "mischaracterized Plaintiff's actions and motives," "failed to thoroughly investigate the domain's ownership history and Plaintiffs claims before filing," and "disregarded evidence of Plaintiffs early involvement and contributions to the company's digital presence." *Id.* ¶ 23. Defendants also "overstated the scope of their trademark rights, used the UDRP process to obtain a valuable domain at minimal cost, and failed to provide evidence of actual consumer confusion caused by Plaintiff's use of the domain." *Id.* ¶ 24. Defendants used the UDRP proceeding to "gain an unfair competitive advantage or disrupt Plaintiff's business, incorrectly labeled Plaintiff's alleged trademark rights and equity agreement as fabrications." *Id.* ¶ 27.

Plaintiff makes claims for (i) breach of contract under New York law, *id.* at 5. and (ii) "reverse domain hijacking" in violation of ACPA, 15 U.S.C. § 114(2)(D)(v), Compl. at 4, 12.[2]

## II.    Defendants' Account of the UDRP Proceedings

Defendants filed the UDRP proceeding before the National Arbitration Forum ("NAF") in February 2024, seeking to have the Domain Name transferred from Plaintiff to UCS.  Dkt. No. 55 ("Frumkin Decl.") ¶¶ 6–7; Dkt. No. 55-5 at 1; Dkt. No. 55-6.[3]  To obtain such relief in the UDRP proceeding, Defendants were required to prove that (1) the Domain Name registered by Plaintiff was identical or confusingly similar to a trademark in which Defendants had rights (e.g., Defendants' UNIVERSAL MUSIC GROUP trademark), (2) that Plaintiff had no rights or legitimate interests in the Domain Name, and (3) the Domain Name had been registered and used by Plaintiff in bad faith.  Frumkin Decl. ¶ 7; Dkt. No. 55-5 at 6.

Defendants claimed that the Domain Name was first registered to Universal Studios, Inc., a predecessor to UCS, in 1998.  Dkt. No. 53 ("Joe Decl.") ¶ 5.  In 2003, the Domain Name was transferred from Universal Studios, Inc. to UCS, which continued to own the Domain Name until June 2016.  *Id*. ¶¶ 6–7.  In approximately June of 2016, UCS inadvertently allowed its registration of the Domain Name to expire "due to communication issues during a transition to a new domain name vendor."  *Id*. ¶ 8.  After this inadvertent June 2016 expiration, the Domain Name became available for third parties to purchase in the domain name marketplace.

---

[2] Plaintiff references a "Breach of Contract/Equity Agreement" claim in the hand-written pro se cover sheet of his Complaint, *see id.* at 5, but not in the typewritten portion of the Complaint.
[3] On a motion to dismiss under Rule 12(b)(6), it would be improper to consider matters outside the pleadings, with limited exceptions.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  However, as set forth below, the Court properly considers evidence outside the pleadings in the course of conducting an independent investigation in response to allegations of fraud on the court.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

Defendants further claimed that in or around October 2017, the Domain Name was acquired by an entity called "U Animation"—which Plaintiff concedes is an entity he owns. Joe Decl. ¶ 9; Frumkin Decl. ¶ 24; Dkt. No. 55-24; *see also* Dkt. No. 54 ("LaBarge Decl.") ¶ 10; Dkt. No. 54-1. On November 11, 2017, UMG CEO Lucian Grainge received an email from Plaintiff, in which Plaintiff stated that he had "recently invested and won a domain auction including company handle Universal Music Group.com, Lucian Grainge.com, and other valuable music assets for 600k." LaBarge Decl. ¶ 10; Dkt. No. 54-1. Plaintiff tried to leverage his new ownership of the Domain Name to induce UMG to enter "a partnership between us on [a] new streaming service Molly (short for Molecule) developed by my stealth company U Animation." *Id*.

This November 2017 email was the beginning of a multi-year series of emails from Plaintiff to UMG attempting to sell the Domain Name for "exorbitant sums." *See, e.g.*, LaBarge Decl. ¶ 11–12; Dkt. No. 54-2 (Dec. 26, 2020 email from Torres to UMG offering to sell the Domain Name for $62,000); Dkt. No. 54-3 (Jan. 7, 2021 email from Torres to UMG offering to sell the Domain Name for $50,000); Dkt. No. 54-4 (invoice sent to UMG's counsel on Mar. 18, 2024 from Torres seeking $10.5 million for work allegedly done by Torres in relation to the Domain Name and the associated website).

In the UDRP proceeding, Plaintiff claimed that he had rights and legitimate interests in the Domain Name and that he had registered and used the Domain Name in good faith. Dkt. No. 55-7 at 9. In support of his arguments, Plaintiff offered the UDRP panel a narrative similar to his pleadings in this case.

Specifically, Plaintiff told the UDRP panel that he had been a teenage intern at "Universal Records"—one of UMG's labels—starting in 2003 and, on May 4, 2003, he

purchased the Domain Name from UCS for $250,000.  Frumkin Decl. ¶ 9; Dkt. No. 55-7 at 1–2.

Plaintiff also claimed that "concurrent with" his supposed acquisition of the Domain Name from

UCS, he obtained a trademark registration from the United States Patent and Trade Office

("USPTO") for the mark UNIVERSAL MUSIC GROUP on September 8, 2003—a move which

he said "solidified [his] ownership and legitimized [his] rights to the domain name." *Id*. at 2, 21.

Finally, Plaintiff claimed that "the legitimacy of [his] interests in The Universal Music Group"

were "recognized" by the former CEO of UMG, Mr. Morris, on September 18, 2003, when Mr.

Morris and Plaintiff supposedly signed a "Website Development and Equity Agreement" under

which Torres, at just fifteen years old, was given a 2% equity interest in UMG in exchange for

Torres "lead[ing] the development of Universal Records Online" using the Domain Name. *Id*. at

2, 29–34.

      In other words, Plaintiff's claim before the UDRP panel was that he (not UCS or UMG)

had owned the Domain Name and the UNIVERSAL MUSIC GROUP trademark since 2003 and,

thus, he had a legitimate interest in the Domain Name and had used and registered it in good

faith to supposedly build a highly successful website associated with the Domain Name.

      The UDRP panel rejected Plaintiff's "claim that [he] has presently or ever held trademark

rights in the UNIVERSAL MUSIC GROUP" and found that the purported trademark registration

and correspondence with the USPTO submitted by Plaintiff were "clumsy and obvious

forgeries."  Dkt. No. 55-5 at 8.  The panel likewise rejected Plaintiff's "extraordinary" claim to

be an owner of 2% of the shares of UMG and found that the agreement submitted by Plaintiff

was an "utterly fantastical and obvious forgery." *Id*.  Finally, the panel rejected Plaintiff's claim

that he had purchased the Domain Name from UCS in 2003, stating that there "is simply no

independent, verified, or trustworthy evidence to support [Plaintiff's] contention that [he]

acquired the Domain Name for $250,000 from [UCS] in 2003 and there is a weight of evidence casting doubt on this claim"—including domain name registration evidence submitted by Defendants, which showed that UCS was the owner of the Domain Name from 2003 until 2016. *Id.* at pp. 8–9.

Ultimately, the UDRP panel concluded that Plaintiff had acquired the Domain Name in 2017 "for the clear purpose of selling (or otherwise leveraging) the Domain Name to [Defendants] or a third party for a . . . valuable consideration in excess of any out-of-pocket cost." *Id.* at 9. Accordingly, the panel held that Plaintiff "lacks rights or legitimate interests in the use of the Domain Name and . . . registered and has used the Domain Name in bad faith" and, thus, the panel ordered the Domain Name to be transferred to Defendants. *Id.* at 5, 10.

Following the result of the UDRP proceeding, Plaintiff filed his Complaint in this action on May 30, 2024, essentially seeking reversal of the UDRP decision. Dkt. No. 1.

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on May 30, 2024, in the United States District Court for the Eastern District of New York. Dkt. No. 1. On June 27, 2024, Plaintiff filed a document consisting of thirteen exhibits referenced in his Complaint. Dkt. No. 8. On July 8, 2024, the Eastern District court transferred the case to this District on the grounds that both Defendants are headquartered in New York County and Plaintiff had made no showing of other reasons that venue should lie in the Eastern District. Dkt. No. 14. This Court denied Plaintiff's motion to transfer the case back to the Eastern District of New York on July 16, 2024, rejecting the same arguments Plaintiff made before the Eastern District. Dkt. No. 19.

On July 19, 2024, Defendants wrote to the Court advising the Court of their position that the documents appended to Plaintiff's Complaint were forged in whole or in part, and advising the Court of their anticipated motion to dismiss. Dkt. No. 22. At a conference on August 6,

2024, the Court stayed discovery pending adjudication of Defendants' anticipated motion to dismiss.  Dkt. Nos. 30, 31.

On August 27, 2024, Defendants moved to dismiss Plaintiff's Complaint.  Dkt. No. 33. The Court denied without prejudice Defendants' motion for failure to comply with Local Civil Rule 12.1 with respect to motions to dismiss that refer to matters outside the pleadings.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Rule 12.1 ("A represented party moving to dismiss or for judgment on the pleadings against a party proceeding pro se, who refers in support of the motion to matters outside the pleadings as described in Fed. R. Civ. P. 12(b) or 12(c), must serve and file the following notice with the full text of Fed. R. Civ. P. 56 attached at the time the motion is served.").

On October 1, 2024, Defendants refiled their motion to dismiss in compliance with Local Civil Rule 12.1.  Dkt. Nos. 50, 51.  In support of their motion, they submit a memorandum of law, Dkt. No. 52, as well as declarations of Monique Joe, Senior Vice President and Assistant Secretary of NBCUniversal Media, LLC, Dkt. No. 53, Brent LaBarge, Head of the Trademark Group and Senior Vice President of Business and Legal Affairs for the Universal Music Group, Dkt. No. 54, and Kimberly B. Frumkin, counsel to Defendants, Dkt. No. 55.

Plaintiff responded in opposition to Defendants' motion to dismiss on October 2, 2024. Dkt. No. 56.  Defendants replied in support of their motion to dismiss on October 11, 2024, Dkt. No. 57, attaching a supplemental declaration of Kimberly B. Frumkin, Dkt. No. 58.  Plaintiff filed a sur-reply on October 14, 2024.  Dkt. No. 59.

On December 27, 2024, Plaintiff filed a motion under Rule 56(d) seeking denial or deferral of adjudication on Defendants' motion to dismiss pending the opportunity for Plaintiff to

take discovery.  Dkt. No. 60.[4]  Defendants responded in opposition to Plaintiff's Rule 56(d)

motion on January 7, 2025.  Dkt. No. 61.  Plaintiff replied in support of his motion on January 7,

2025.  Dkt. No. 62.

On March 4, 2025, the Court issued an order clarifying that Defendants' renewed motion to

dismiss and Plaintiff's Rule 56(d) motion were fully submitted and *sub judice* upon the above-

enumerated briefings, and that no further filings would be considered in connection with those

motions.  Dkt. No. 73.[5]

## DISCUSSION

Defendants seek dismissal of Plaintiff's Complaint both as a matter of the Court's

inherent power to prevent fraud on the Court and pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure for failure to state a claim.  Because the possibility of fraud on the Court

creates a threshold question as to whether Plaintiff is entitled to adjudication on the merits of his

claim, the Court addresses only Defendants' motion for dismissal under the Court's inherent

powers.

## I.    Legal Standard: Fraud on the Court

Defendants argue that the critical documents appended to Plaintiff's Complaint in support

of his claims are forgeries, designed to knowingly perpetuate a fraud on the Court.  Dkt. No. 52

at 13–20.  Defendants urge that because the Plaintiff's case is based on fabricated evidence, the

---

[4] In their opposition, Defendants correctly point out that Plaintiff had already included a motion under Rule 56(d) in his opposition to their motion to dismiss.  *See* Dkt. No. 56 at 1, 4.

[5] Notwithstanding the Court's order, Plaintiff has made roughly forty additional filings on the docket since that date.  By orders of February 27, March 3, and March 6, 2025, the Court ruled that if Defendants' motion to dismiss were granted, Plaintiff would have the opportunity, by motion filed within fourteen days from the date of the Court's order, to put additional information before the Court through a motion for reconsideration, limited to 25 double-spaced pages.  Dkt. Nos. 69, 71, 75.  The Court thus disregards those filings for the purposes of the two motions at issue here.  *See* Dkt. No. 95 (relieving Defendants of any obligation to respond to Plaintiff's additional filings absent further order of the Court).

appropriate result is to dismiss Plaintiff's case in its entirety, with prejudice, pursuant to the Court's inherent powers. Dkt. No. 52 at 2.

The Court has inherent "power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Corto v. Nat'l Scenery Studios*, 112 F.3d 503, *3 (2d Cir. 1997) (unpublished table decision) ("A court has inherent authority, however, to conduct an investigation to determine if it is the victim of a fraud, and may impose sanctions, including dismissal, upon determining that such a fraud has taken place."); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989) ("Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system."). Such power exists independent of any wrong done to or relief sought by any individual litigant, as "tampering with the administration of justice" by perpetuating fraud on the court "involves far more than an injury to a single litigant," *Chambers*, 501 U.S. at 44 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)), because such fraud "is a wrong against the institutions set up to protect and safeguard the public." *Id.*; *Hazel–Atlas*, 322 U.S. at 246 ("[I]t cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."). It also is not displaced by statute or by the Federal Rules of Civil Procedure governing litigation misconduct. *See Chambers*, 501 U.S. at 48.[6] Fabrication of evidence "is a near-classic

---

[6] The Supreme Court has instructed that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the [Federal] Rules [of Civil Procedure], the court ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50. However, it also has made clear that, where "neither the statute nor the Rules are up to the task," the injured litigant need not exhaust remedies under the Federal Rules of Civil Procedure

example" of fraud upon the court. *Aoude*, 892 F.2d at 1118; *see also Rozier v. Ford Motor Co*., 573 F.2d 1332, 1338 (5th Cir. 1978) ("[O]nly the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party . . . will constitute a fraud on the court."); *Stonecreek - AAA, LLC v. Wells Fargo Bank N.A.*, 2014 WL 12514900, at *2 (S.D. Fla. May 13, 2014) ("[F]abrication of evidence" is "the near-classic example" of fraud on the court); *Colella v. Republic of Argentina*, 2020 WL 4700930, at *7–8 (S.D.N.Y. Aug. 13, 2020) (noting that the court "struggle[d] to conjure examples of bad faith conduct by litigants more egregious than using fake documents to secure a judgment.").

A determination that an investigation should be launched and a complaint should be dismissed because fraud has been committed upon the court is not idly made. Several principles have emerged from prior case law. First, a dismissal for fraud upon the court requires some finding of intent. The guilty party must have "*sentiently* set in motion some unconscionable scheme *calculated* to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense," *Aoude*, 892 F.2d at 1118 (emphasis added), or have "acted knowingly

---

before bringing to the Court's attention a fraud on the Court and asking for an independent investigation. *Id.* at 50. In this Cout's informed judgment, Rule 11—which might govern some of the alleged conduct here—appears not to be up to the task. That rule contains significant procedural requirements including that, before a motion is made, the moving party must serve the proposed motion on the offending party and give him the opportunity to withdraw or correct the challenged paper. Fed. R. Civ. P. 11(c)(2); *see Recoop LLC v. Outliers Inc*., 2025 WL 1725024, at *13 (S.D.N.Y. June 20, 2025) (discussing notice and safe-harbor period under Rule 11). The conduct here is not limited to the presentation of factual contentions that have no actual or likely evidentiary support. *See* Fed. R. Civ. P. 11(b)(3). Crediting Defendants' assertions, Plaintiff's entire case is based upon an edifice of fraudulent and forged documents concocted for the purposes of extortion. *Cf. Chambers*, 501 U.S. at 50–51 (affirming district court's decision to impose sanctions under inherent powers where Rule 11 was insufficient to reach all conduct at issue); *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 442 n.2 (S.D.N.Y. 2002) (dismissing complaint under inherent powers and finding Rule 37 sanctions insufficient).

in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *Skywark v. Isaacson*, 1999 WL 1489038, at \*14 (S.D.N.Y. Oct. 14, 1999), *aff'd* 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000); *see also Esposito v. Suffolk County Community College*, 390 F. Supp. 3d 428, 430–31 (E.D.N.Y. 2019) (considering whether the "misconduct was the product of intentional bad faith") (quoting *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 446 (S.D.N.Y. 2002)).  Where the offending party has not engaged in "prolonged and repetitive campaigns of egregious conduct designed to prevent the factfinder from discovering the untruthfulness of her claims" and where forged evidence was not "central" to the offending party's case, courts have been willing to consider lesser sanctions.  *Esposito*, 390 F. Supp. 3d at 431.[7]

Second,  the court considers whether the fabricated evidence or suborned perjury is material and prejudicial to the other side.  The falsified evidence must have "the capacity to influence the adjudication," *Aoude*, 892 F.2d at 1120, or "seriously affect[t] the integrity of the normal process of adjudication."  *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988). "[A]n isolated instance of perjury, standing alone, will not constitute a fraud upon the court." *McMunn*, 191 F. Supp. 2d at 445 (citing *Gleason*, 860 F.2d at 560).  Put otherwise, it must be of the type that makes it "so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases."  *Hodges v. Yonkers Racing Corp*. 48 F.3d 1320, 1325 (2d Cir. 1995) (internal quotation and citation omitted)).

---

[7] Ultimately, in *Esposito*, the district court dismissed the complaint after the plaintiff's misrepresentations and fabrications continued despite the prior court orders.  *Esposito v. Suffolk Cnty. Cmty. Coll.*, 517 F. Supp. 3d 126, 137 (E.D.N.Y. 2021).  The Second Circuit affirmed. *Esposito v. Suffolk Cnty. Cmty. Coll.*, 2023 WL 192671, at \*3 (2d Cir. Jan. 17, 2023) (summary order).

Third, the evidence or testimony must be false.  It is not enough that there is a dispute as to authenticity.  The question of whether a document is authentic or a fabricated ordinarily belongs to the jury—even at summary judgment, where authenticity turns upon judgments of credibility, the court must leave that question to the jury.  Fed. R. Evid. 1008(a) and (b); *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) ("On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried.").  The court has only a limited power to determine the authenticity of a document for itself.  To raise a question of fact regarding a document's authenticity at trial, there need only be "evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  And where there is no evidence of fraudulent intent and there are genuine issues of material fact regarding the authenticity of a document, a litigant cannot in advance enlist the court as an ally and ask the court to discard evidence upon which its adversary's claim may rest.  But that does not mean that the Court has no role as gatekeeper to protect a jury (or the litigation process) from being abused and misused by plainly forged or fraudulent evidence.  Even at trial, for a document to be authenticated, there must be "'sufficient proof . . . that a reasonable juror could find in favor of authenticity or identification.'"  *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (quoting *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir.), *cert. denied*, 502 U.S. 938 (1991)). "[T]he standard for authentication, and hence for admissibility, is one of reasonable likelihood." *Id.* (quoting *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994)); *see also United States v. Vayner*, 769 F.3d 125, 130–31 (2d Cir. 2014) (holding that evidence was insufficient to establish authenticity under Rule 901).  Where there exists "a plethora of evidence establishing the disingenuous nature of a document that is the linchpin of an action," and there is an "absence

of evidence to the contrary," "requiring an action to go forward would permit a plaintiff who is perpetrating a fraud on the court to run roughshod over the court's integrity." *Ceglia v. Zuckerberg*, 2013 WL 1208558, at *11 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted*, 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd*, 600 F. App'x 34 (2d Cir. 2015); *see also Shangold v. Walt Disney Co.*, 2006 WL 71672, at *3 (S.D.N.Y. Jan. 12, 2006) (complaint dismissed for fraud upon the court where plaintiffs' testimony that a document was authentic was contradicted by "voluminous, independent, and irrefutable" evidence to the contrary), *aff'd*, 275 F. App'x. 72 (2d Cir. 2008); *Pope v. Federal Express Corp.*, 974 F.2d 982, 983 (8th Cir. 1992) (relying on "expert testimony and demonstrative evidence" in finding note submitted by plaintiff in support of plaintiff's claim "had been manufactured as a cut and past composite of other documents" and thus fabricated).

In deciding the appropriate sanction, the court also considers whether and when the misconduct was corrected, whether abuses were repeated rather than isolated or discrete, the efficacy of lesser sanctions, and whether further misconduct is likely to continue in the future. *See McMunn*, 191 F. Supp. 2d at 446; *Skywark*, 1999 WL 1489038, at *15 (collecting cases); *Shangold*, 2006 WL 71672, at *4.

Finally, before a court may exercise its inherent power to dismiss a complaint, it must find by clear and convincing evidence that fraud has been perpetrated on the court. *See Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995) (requiring a district court to find by "clear and convincing evidence" that abusive behavior occurred to dismiss a suit for abusive behavior under inherent power); *Shangold*, 275 F. App'x at 73 (affirming district court's dismissal for fraud on the court under the "clear and convincing evidence" standard) (summary order); *Esposito v. Suffolk Cnty. Cmty. Coll.*, 2019 WL 1044099,

at *2 (E.D.N.Y. Mar. 4, 2019); *McMunn*, 191 F. Supp. 2d at 445; *see also Gupta v. Walt Disney World Co.*, 482 F. App'x. 458, 459 (11th Cir. 2012) ("Clear and convincing evidence of egregious conduct [is] required to establish fraud on the court.").

From a procedural perspective, the Court's exercise of its inherent powers "must comply with the mandates of due process." *Chambers*, 501 U.S. at 50. An offending party must have sufficient notice of the possible consequences of its misconduct, and an opportunity to be heard. *See id.* at 56 ("[W]hile the sanction was not assessed until the conclusion of the litigation, Chambers received repeated timely warnings both from NASCO and the court that his conduct was sanctionable."); *McMunn*, 191 F. Supp. 2d at 445 ("Due process, in the context of sanctioning an attorney or a party, required that [the sanctioned party] be granted notice and an opportunity to be heard."). The application to dismiss a complaint for fraud upon the court must be "supported by affidavits or other acceptable evidence." *Hazel-Atlas*, 322 U.S. at 248.

Frequently, a complaint is dismissed only after a party has had a hearing. *See Esposito*, 2019 WL 1044099, at *4 (noting that the court "doubts" the authenticity of the document in question but nonetheless "believes that an evidentiary hearing in this regard would be prudent considering the gravity of the Defendants' accusations"); *Zimmerman v. Poly Prep Country Day Sch.*, 2012 WL 2049493, at *35 (E.D.N.Y. June 6, 2012) (scheduling evidentiary hearing for determination regarding claim of fraud on the court "because credibility issues are critical to determination of the" motion) (collecting cases); *Shah v. Eclipsys Corp.*, 2010 WL 2710618, at *15 (E.D.N.Y. July 7, 2010) ("Although an evidentiary hearing is not always necessary before finding a party has committed fraud on the court, many courts in this circuit and elsewhere have exercised their discretion to hold an evidentiary hearing before imposing sanctions on this basis."). Where courts have not conducted an evidentiary hearing before dismissing a case for

fraud on the court, generally the litigation had advanced to a point at which the sanctioned party had been deposed or where some limited discovery into the fraud had occurred. *See Shangold*, 275 F. App'x at 74 (affirming dismissal after both plaintiffs had been deposed); *Aoude*, 892 F.2d at 1122 (affirming dismissal after numerous depositions conducted and other discovery undertaken); *McMunn*, 191 F. Supp. 2d at 443–45 (dismissal after plaintiff had been deposed, two hours of oral argument, and evidentiary presentations, including the opportunity to present expert testimony); *Ceglia*, 2013 WL 1208558, at *73 (dismissal after discovery limited to documents' authenticity, including preparation of expert reports).[8] However, the opportunity to be heard need not always take the form of an evidentiary hearing, especially where the material facts are undisputed. *See Aoude*, 892 F.2d at 1120.[9]

## II.    The Court Will Conduct an Independent Investigation of Fraud Upon the Court

Defendants have submitted evidence that numerous of the documents that Plaintiff has submitted to the Court in connection with his Complaint are forged, that Plaintiff acted with fraudulent intent in submitting those documents, and that those documents are central to his

---

[8] A magistrate judge has stated that "[a]s use of the court's inherent power to dismiss a case based on a fraud on the court was recognized at common law and under the court's equity jurisdiction prior to the adoption of the Seventh Amendment, dismissing Plaintiff's case based on such fraud does not violate Plaintiff's right to a jury trial under the Seventh Amendment." *Ceglia*, 2013 WL 1208558, at *9; *see Hazel–Atlas*, 322 U.S. at 244 (noting that equitable relief from fraudulently obtained judgment based on fabricated document was "firmly established in English practice long before the foundation of our Republic").

[9] In some instances, courts have dismissed with prejudice where the offending party has admitted or failed to dispute that a document was inauthentic. *See Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 440 (S.D.N.Y. 2002) ("It is undisputed that the copy of the . . . advertisement that was attached to [defendant's] counterclaims is not a true and correct copy of the advertisement . . . the Court finds that [defendant's] submission of the altered advertisement as an exhibit to her counterclaims represents sanctionable conduct."), *aff'd*, 81 F. App'x 396 (2d Cir. 2003); *Aoude*, 892 F.2d at 1117 ("[D]uring his own deposition, Aoude was confronted with Monahan's testimony and only then admitted the scheme."); *McMunn*, 191 F. Supp. 2d at 454 ("Ms. McMunn does not challenge the conclusion of Mr. Aschkenasy that Tape Three contains a purposefully edited version of a conversation also found on Tape Four.").

claims.  The Court does not exhaustively recite that evidence here, nor prejudge the ultimate persuasiveness of that evidence, but rather notes some of the critical points warranting further investigation.

One of the set of documents that Plaintiff submitted in support of his complaint are what purport to be official notices, correspondence, and trademark registration documents from the United States Patent and Trade Office.  Dkt. No. 8 at 21–24.  Plaintiff offers the documents in support of his claim to ownership of the Domain Name as early as 2003.  *Id*.  Defendants, however, have offered evidence that the documents are forgeries.  The appended Trademark Registration purports to reflect that on September 8, 2003, Plaintiff registered the mark "UNIVERSAL MUSIC GROUP."  *Id.* at 22.  The document appears to include the seal of the U.S. Patent and Trade Office and includes the signature of David S. Kappos in his capacity as the Director of that office.  *Id.*  However, the registration number listed in the Registration (U.S. Registration No. 4160209) appears to correspond not to UNIVERSAL MUSIC GROUP but instead to a 2012 registration for the mark "GREENARM CLEANING PRODUCTS."  Frumkin Decl. ¶ 10; Dkt. No. 55-8.  Moreover, Mr. Kappos did not join the USPTO until 2009.  *See* Frumkin Decl. ¶ 11; Dkt. No. 55-9.

Plaintiff appends a June 30, 2003 Notice of Publication, July 31, 2003 Notice of Allowance, and September 9, 2009 Notice of Abandonment from the USPTO, each referring to Trademark Application Serial Number 76750823 in connection with the mark UNIVERSAL MUSIC GROUP.  However, the Trademark Application Serial Number 76750823 listed in all three of these documents does not appear to exist in the USPTO's Trademark Status and Document Retrieval database.  Frumkin Decl. ¶ 12; Dkt. No. 55-10.  There is, moreover, sworn evidence that (i) there has never been "a trademark registration for UNIVERSAL MUSIC

GROUP with a registration number 4160209"; (ii) the "USPTO does not reuse registration numbers"; (iii) the Application Serial Number 76750823 "does not identify an existing, valid serial number for a U.S. trademark application"; and (iv) the two purported USPTO emails from "Patricia" submitted by Torres "are not USPTO communications." Dkt. No. 55-11. The documents appear to be material to Plaintiff's claim, as they are one of the main supports for his contention that he, and not Defendants, had a protectable trademark in the name UNIVERSAL MUSIC GROUP as early as 2003 for the purposes of his ACPA claim under 15 U.S.C. § 1125(d).

Plaintiff has also attached to his complaint domain purchase and renewal emails purporting to reflect Plaintiff's alleged May 4, 2003 purchase of the Domain Name and January 13, 2012 renewal thereof. Dkt. No. 8 at 4–9. These documents appear to be central to Plaintiff's claim that he has owned the Domain Name continuously since 2003. But there is evidence that these documents too are forgeries. In his own submission in support of his Complaint, Plaintiff includes a series of messages exchanged with Steve Levy, who Defendants describe as Defendants' UDRP counsel, in which Plaintiff states that the Domain Name "was initially registered by David Dolgin for Universal Studios in 1998," then "transferred to Universal City Studios and remained under the ownership of that company in 2009." *Id.* at 93. In the same text, Plaintiff refers to "my Nov. 11, 2017 email" and states that "[w]hile I did invest and win the domain in an auction, its [sic] important to clarify that the domain wasnt [sic] entirely under my ownership until that date." *Id.* In Plaintiff's November 2017 email to Grainge, Plaintiff stated that he had "recently invested and won a domain auction including company handle Universal Music Group.com, Lucian Grainge.com, and other valuable music assets for 600k," making no mention of his alleged ownership of the Domain Name since 2003. LaBarge Decl. ¶ 10; Dkt.

No. 54-1.  The emails are inconsistent with the notion that Plaintiff obtained the Domain Name

in 2003 and held it continuously until the UDRP proceeding.

Furthermore, Defendants present evidence from the Wayback Machine that the Network

Solutions logo shown on the Domain Purchase Email and the Domain Name Transfer Agreement

was not used by Network Solutions until 2013 or 2014, and the SnapNames logo appearing on

the same documents was not used by SnapNames until 2012.  *Compare* Dkt. 8 at 4–5 *with*

Frumkin Decl. ¶¶ 17–20; Dkt. Nos. 55-15 through 55-20.  Moreover, both documents feature the

logos of both Network Solution and SnapNames, suggesting they were part of the same company

in 2003.  Dkt. No. 8 at 4–5.  However, Defendants offer evidence that Web.com, the owner of

Network Solutions, did not purchase SnapNames until 2014, more than a decade after the date of

the purported Domain Name Transfer Agreement.  *See* Frumkin Decl. ¶ 21; Dkt. No. 55-21.

Evidence from the Wayback Machine does not necessarily demonstrate that the documents are

forgeries but, combined with the evidence from the face of the documents, they raise a

substantial question of the document's authenticity.  *Cf.* Fed. R. Evid. 901(b)(4) (distinctive

characteristics of a document properly considered in determining authenticity).

Defendants also submit evidence that Plaintiff's social media screenshot purporting to

show his investment in the Domain Name in the form of an advertisement on Facebook, Dkt. No.

8 at 17, is forged.  The screenshot shows an advertisement for the Domain Name on the social

media site Facebook, with the caption "FASTEN YOUR SEATBELTS, AS WE PREPARE TO

BLAST OFF INTO A DIGITAL GALAXY OF MUSIC AND SOUND" and an image of a

rocket ship.  *Id.*  Defendants point out that although the Facebook screenshot is undated, it

includes a 2003 copyright notice in the bottom right corner: "Facebook © 2003."  Dkt. No. 8 at

17.  They urge that, as a matter of public record, Facebook was not founded until February 2004.

*See* Frumkin Decl. ¶ 22; Dkt. No. 55-22 (in Facebook's Form S-1 Registration, Statement, stating under "Our History" that Facebook was founded in February 2004); *see also Antares Mgmt. LLC v. Galt Glob. Cap., Inc.*, 2013 WL 1209799, at *1 n.1 (S.D.N.Y. Mar. 22, 2013) (noting that Facebook was "founded in 2004").

Defendants also offer evidence that the document purporting to be an excerpt from a WIRED magazine article containing a picture of Plaintiff and Doug Morris and making mention of a "talented intern" at Universal Records named "John T.," Dkt. No. 8 at 31, is forged, and that WIRED never published such an article. Defendants submit the sworn declaration of Cynthia A. Cathcart, Director of Library and Information Services for Advance Magazine Publishers Inc. d/b/a Condé Nast ("Condé Nast"), the publisher of WIRED magazine. Dkt. No. 58-1. In her declaration, Ms. Cathcart declares that Condé Nast "conducted a search of WIRED's print issues published in the U.S." from 2003 to 2006 "and found no article matching" the "[p]urported [e]xcerpt" of the WIRED article attached. *Id.* Defendants also assert that their own search of the magazine's online archives for the name "Doug Morris," and for the name "John T.," found no reference to this article, though the archives date back to the late 1990s. Frumkin Decl. ¶¶ 14–16; Dkt. Nos. 55-12, 55-13. Of course, this evidence, viewed in isolation, would not necessarily preclude a finding that the article is authentic. Libraries are sometimes incomplete, and searches are imperfect. But the evidence cannot be viewed in isolation, and Plaintiff has not offered any evidence to suggest the article is authentic.

As to the Equity Agreement, Dkt. No. 8 at 25–30, Defendants point out the extreme improbability that Defendants would have entered into such an agreement with Plaintiff, who would have been fifteen in September 2003, based on the drivers license that he submitted with his Complaint. *See id.* at 32 (showing John Adrian Torres's date of birth as November 30,

20

1987).  As the Court noted at the August 6 Conference, if the Universal Equity Contract were real, it defies logic that Torres never exercised any of his options.  Dkt. No. 31 at 15:9–16:8. Defendants also offer that they have "conducted a search of its records and the records of its affiliates and has found no record or copy of the Universal Equity Contract."  Dkt. No. 52 at 16. They offer as evidence of that proposition the declaration of Brent LaBarge, in which LaBarge, Head of the Trademark Group and Senior Vice President of Business and Legal Affairs for the Universal Music Group, declares that he "instructed a search of UMG's records and the records of its affiliates for this agreement.  This search found no record or copy of this purported agreement."  LaBarge Decl. ¶ 8.  He also declares that he "instructed a search of UMG's records and the records of its affiliates for any agreement with anyone named John or Jonathan Torres, with or without the middle name Adrian or middle initial A.  This search found no record or copy of any such agreements."  *Id.* ¶ 9.  Defendants also disclaim any record of Plaintiff ever having been an intern at Universal Music Group.  *See* LaBarge Decl. ¶ 6 ("I instructed a search of UMG's records and the records of its affiliates for the names of current and past interns and employees.  This search found no results for anyone named  John or Jonathan Torres, with or without the middle name Adrian or middle initial A.").[10]

When a party knowingly fabricates evidence, "[b]ad faith is manifest," almost by definition.  *Aoude*, 892 F.2d at 1118.  The evidence presented, especially when taken as a whole, amply justifies an independent investigation into whether fraud has been committed upon the Court.  *See Esposito*, 390 F. Supp. 3d at 428 (noting that court had referred case to magistrate judge for evidentiary hearing regarding fraud on the court).  If credited, Defendants' evidence

---

[10] Defendants do not, however, offer a declaration or affidavit from Doug Morris himself disclaiming his participation in such an agreement.

would inculpate Plaintiff not only in a fraud upon the Court but potentially in the commission of a federal felony.  *See* 18 U.S.C. § 506 (penalizing with up to five years imprisonment one who "falsely makes, forges, counterfeits, mutilates, or alters the seal of any department or agency of the United States" or "knowingly uses, affixes, or impresses any such fraudulently made, forged, counterfeited, mutilated, or altered seal or facsimile thereof to or upon any certificate, instrument, commission, document, or paper of any description"); *United States v. Langlois*, 421 F. App'x 429, 430 (5th Cir. 2011) (affirming district court's imposition of six months' imprisonment and three years' supervised release for forging a government seal in violation of 18 U.S.C. § 506, where defendant sent letters bearing counterfeit seal of the United States Office of Management and Budget to victims).

Given that the case is in its very incipiency, these allegations of fabrication are heatedly disputed by the Plaintiff, and Plaintiff has not yet been given the opportunity to testify, the Court concludes that the prudent way to proceed is to conduct the investigation and set this case for a hearing.  The Court will schedule a conference to set the contours for that hearing.

## CONCLUSION

To the extent Defendants' motion seeks a hearing and an independent investigation into fraud on the court, the motion is GRANTED.  To the extent the motion asks the Court to dismiss the Complaint pursuant to this Court's inherent powers, it is DENIED WITHOUT PREJUDICE. Defendants' motion to dismiss pursuant to Ruel 12(b)(6) is likewise DENIED WITHOUT PREJUDICE.  Plaintiff's motion pursuant to Rule 56(d) is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 50, 60.

SO ORDERED.

Dated: September 23, 2025
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge