UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                            :

JOHN ADRIAN TORRES,              :

                            :

           Plaintiff,         :

                            :        24-cv-5323 (LJL)

      -v-                 :

                            :       OPINION AND ORDER

UNIVERSAL MUSIC GROUP N.V. and UNIVERSAL  :
CITY STUDIOS LLC,                :

                            :

           Defendants.     :

                            :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/05/2026

LEWIS J. LIMAN, United States District Judge:

Plaintiff John Adrian Torres ("Plaintiff") brings suit against Defendants Universal Music Group N.V. ("UMG") and Universal City Studios LLC ("UCS" and together with UMG, "Defendants") for (i) breach of contract under New York law, and (ii) "reverse domain hijacking" in violation of the Anticybersquatting Consumer Protection Act ("ACPA"). Dkt. No. 1 ("Compl."). The gravamen of Plaintiff's Complaint is his claim that as an intern for UMG in 2003, he acquired the domain "universalmusicgroup.com" (the "Domain Name"), *id.* ¶ 7; that Universal Records, one of UMG's labels, gave him a Website Development and Equity Agreement dated September 18, 2003 (the "Equity Agreement"), pursuant to which he was granted options to purchase two percent of all of the company's shares for a price of five dollars each in exchange for his agreement to lead the development of Universal Records Online and his grant to Universal Records of the right to use the trademark "Universal Music Group" and "Universal Music Group.com" for the online platform, Dkt. No. 8 at 25–30;[1] that Defendants failed to compensate him properly under the Equity Agreement, Compl. at 5; and that

---

[1] Citations to this docket entry use ECF pagination.

Defendants initiated a baseless complaint under the Uniform Domain Name Dispute Resolution Policy ("UDRP") to strip him of his rights to the Domain Name, *id.* ¶ 18.

By Opinion and Order of September 23, 2025, the Court found that Defendants had offered sufficient evidence to warrant an independent investigation by the Court into whether Plaintiff had committed fraud upon the Court by making false allegations and submitting fabricated evidence in connection with his Complaint.  Dkt. No. 115; *Torres v. Univ. Music Group N.V.*, 2025 WL 2710114, at *10 (S.D.N.Y. Sept. 23, 2025).  The Court permitted Plaintiff to testify to answer the allegations that he committed fraud upon the Court and permitted Defendants to cross-examine Plaintiff.  Dkt. No. 122.  The Court held such a hearing on November 24, 2025.  Dkt. Nos. 130, 133-1.  It now concludes that Plaintiff has committed fraud upon the Court and dismisses his Complaint.

**LEGAL STANDARD**

The Court has previously stated the law with respect to dismissals for fraud upon the Court:

> The Court has inherent "power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Corto v. Nat'l Scenery Studios*, 112 F.3d 503, *3 (2d Cir. 1997) (unpublished table decision) ("A court has inherent authority, however, to conduct an investigation to determine if it is the victim of a fraud, and may impose sanctions, including dismissal, upon determining that such a fraud has taken place."); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989) ("Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system.").  Such power exists independent of any wrong done to or relief sought by any individual litigant, as "tampering with the administration of justice" by perpetuating fraud on the court "involves far more than an injury to a single litigant," *Chambers*, 501 U.S. at 44 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)), because such fraud "is a wrong against the institutions set up to protect and safeguard the public." *Id.*; *Hazel--Atlas*, 322 U.S. at 246 ("[I]t cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants.  The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.").  It also is not displaced by statute or by the Federal Rules

of Civil Procedure governing litigation misconduct. *See Chambers*, 501 U.S. at 48. Fabrication of evidence "is a near-classic example" of fraud upon the court. *Aoude*, 892 F.2d at 1118; *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) ("[O]nly the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party . . . will constitute a fraud on the court."); *Stonecreek - AAA, LLC v. Wells Fargo Bank N.A.*, 2014 WL 12514900, at *2 (S.D. Fla. May 13, 2014) ("[F]abrication of evidence" is "the near--classic example" of fraud on the court); *Colella v. Republic of Argentina*, 2020 WL 4700930, at *7–8 (S.D.N.Y. Aug. 13, 2020) (noting that the court "struggle[d] to conjure examples of bad faith conduct by litigants more egregious than using fake documents to secure a judgment.")

*Torres*, 2025 WL 2710114, at *5.

Before the Court dismisses a complaint for fraud upon the Court, it considers: (1) whether the offending party acted with fraudulent intent "to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action," *Skywark v. Isaacson*, 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999), *report and recommendation adopted*, 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000); (2) whether the fabricated evidence or suborned perjury was material and prejudicial to the other side or had "the capacity to influence the adjudication," *Aoude*, 892 F.2d at 1120; and (3) whether the evidence or testimony was false, *Torres*, 2025 WL 2710114, at *5–6. In deciding the appropriate sanction, the Court also considers whether and when the misconduct was corrected, whether abuses were repeated rather than isolated or discrete, the efficacy of lesser sanctions, and whether further misconduct is likely to continue in the future. *Id.* at *7. Before a court exercises its inherent power to dismiss a complaint, it must find by clear and convincing evidence that a fraud has been perpetrated on the Court. *Id.*

## DISCUSSION

There is clear and convincing evidence, indeed evidence beyond a reasonable doubt, that Plaintiff has perpetrated a fraud upon the Court, that his fraud was intentional and material, that it was not isolated or discrete, and that—absent dismissal—it is likely to continue in the future.

3

The Court previously recounted the documents submitted by Plaintiff and made attachments to the Complaint that appear to be forged:

(1) A Notice of Allowance purportedly issued by the U.S. Patent and Trademark Office to Plaintiff bearing a date of July 31, 2003 and indicating he was the owner of the mark Universal Music Group; a document with the legend United States of America, United States Patent and Trademark office, purportedly signed by David S. Kappos, stating that Plaintiff registered the mark Universal Music Group with a registration number 4,160,209 on September 8, 2003; a Notice of Abandonment also allegedly from the United States Patent and Trademark Office, with a mailing date of September 9, 2009, indicating that Plaintiff was the owner of the mark Universal Music Group which was abandoned because a response to an office action on March 10, 2009 was not received within the 6-month response period; a Notice of Publication allegedly issued by the United States Patent and Trademark Office for the mark "Universal Music Group" with an alleged publication date of June 30, 2003 by Plaintiff as applicant; and an email signed only by a "Patricia," purportedly from the United States Patent and Trademark Office, stating that the trademark for Universal Music Group was registered to Plaintiff in September 2003, but that the trademark registration number was then used for another trademark "due to the cancellation of the original registration." Dkt. No. 8 at 20–24.

(2) Domain purchase and renewal emails purported to reflect Plaintiff's alleged May 4, 2003 purchase of the Domain Name and January 13, 2012 renewal thereof. Dkt. No. 8 at 4–11.

(3) A social media screenshot purporting to show Plaintiff's investment in the Domain Name in the form of an advertisement on Facebook with a copyright notice in the bottom right corner: "Facebook 2003." Dkt. No. 8 at 17.

(4) A document purporting to be an excerpt from a WIRED magazine article containing a picture of Plaintiff and former Universal Music Chief Executive Officer Doug Morris making mention of a talented intern named "John T." Dkt. No. 8 at 31.

(5) The Equity Agreement dated September 8, 2003, when Plaintiff was fifteen years old. Dkt. No. 8 at 25–30.

*See Torres*, 2025 WL 2710114, at *8.

The Court has previously described the evidence that those documents are forgeries. The Court incorporates the discussion in its Opinion and Order of September 23, 2025. *Torres*, 2025 WL 2710114. In brief, Mr. Kappos did not join the USPTO until 2009; the registration number alleged to correspond to Universal Music Group in fact belongs to Greenarm Cleaning Products; the serial number listed in the Notice of Publication, Notice of Allowance, and Notice of

4

Abandonment does not exist in the USPTO's Trademark Status and Document retrieval database; the USPTO does not reuse registration numbers; and the emails from "Patricia" are not USPTO communications. *Id.* at \*8. The domain purchase and renewal emails are inconsistent with Plaintiff's own prior representations that he acquired the Domain Name in 2017 and contain logos that were not used at the time the emails purportedly were drafted. *Id.* at \*8–9. Facebook was not founded until February 2004. *Id.* at \*9. WIRED never published the article Plaintiff submitted as a WIRED magazine article. *Id.* at \*9. In addition to the fantastical nature of the Equity Agreement, there is no record at Universal Music Group either that Plaintiff was ever an intern or that he ever signed such an agreement. *Id.* All of the documents are material. They are critical to Plaintiff's breach of contract and anti-cybersquatting claims.

Plaintiff's response to the Court's Opinion and Order confirms both that he has attempted to commit a fraud upon the Court and that, if the Court does not dismiss the Complaint, he is likely to continue with his fraudulent conduct. Rather than defend his submission of the false documents, Plaintiff has withdrawn his reliance on the USPTO documents, the social media content including the image depicting Facebook 2003, the purported WIRED magazine article and all "[a]rticles or excerpts attributed to third-party publications," and "[a]ny receipts, invoices, or logo-marked materials referencing Network Solutions of SnapNames that cannot be independently authenticated." Dkt. No. 121. He offers no explanation of why he submitted them in the first place. He also does not defend the submission of the Equity Agreement but instead—having been caught in the submission of a forged document—withdraws that as well. Dkt. No. 130 ("Tr.") at 31:2–9; Dkt. No. 132 at 4.[2]

---

[2] Citations to this docket entry use ECF pagination.

The testimony at the hearing confirms that Plaintiff acted with intent to defraud. When asked when and how he received the USPTO documents, he contradicted himself. He first testified that he "definitely" received the documents in the mail from the USPTO in 2009 after he called the USPTO's "general phone number" and asked for "any documentation" that he registered the mark for Universal Music Group. Tr. at 16:21–18:14, 19:3–20. But he later testified that he called the USPTO in "March of 2024" and asked for the documents. *Id.* at 25:19–26:20. The testimony is irreconcilable. Plaintiff failed to adequately explain why, if he received the documents in 2009, he called to ask for them in 2024. *Id.* at 26:17–20, 27:34. He acknowledged that the 2024 email purportedly from "Patricia" at the USPTO contained incorrect information, namely that the 2003 registration was authorized by David Kappos, who was not director of the USPTO at the time. *Id.* at 29:8–18. However, he maintained that the email was not fabricated and dismissed the letter from a USPTO official certifying that the email is not USPTO communication by stating that the official's certification needed "more context." *Id.* at 28:18–19. Plaintiff testified that when submitting the materials from the USPTO, he hoped the Court would infer that he owned the trademark. *Id.* 30:16–31:11. Having observed Plaintiff's demeanor at the in-court hearing, the only conclusion that the Court can draw, and the conclusion it does draw, is that the documents were fabricated by Plaintiff himself or by someone else with Plaintiff's knowledge and that Plaintiff intended to defraud both the Court and his adversary.

Plaintiff's testimony at the hearing also corroborates that the Equity Agreement is a forgery. On its face, the document itself bears every indication that it is a fake. The language it uses is unlike any in a document from a major corporation. The section setting forth the number of options is reproduced below:

## 2.3 Number of Options:

The total number of stock options granted to John Torres under this agreement is

**Stock Options:**

**Grant:** John Torres has been given the right to buy a portion of the company's shares. This is a way to involve him in the company's success.

**Percentage:** John's options represent 2% of all the company's shares. If there are a million shares, he gets the right to buy 20,000 shares.

**Exercise Price:** The price John can buy the shares for is set at $5 each. This is like a special deal for him.

**Vesting:** John can't buy all the shares at once. He earns the right to buy a portion each year, encouraging him to stay and help the company grow.

**Example:** After one year, John can buy 25% (5,000 shares) at $5 each. If the share price is higher, he can buy them and maybe sell them for a profit.

**Total Value:** If John exercised all his options, he could potentially buy $1,000,000 worth of shares at the agreed-upon price.

Dkt. No. 8 at 26.

Plaintiff is described in the Equity Agreement as "Intern Web Developer" with the responsibility to "lead the development of Universal Records Online." *Id.* at 25, 27.  The Equity Agreement purports to have the signature of Doug Morris as Universal Records Chairman and Plaintiff with a date of September 18, 2003. *Id.* at 30.  However, when asked during the hearing whether he was an intern in 2003 when he was fifteen years old, Plaintiff testified "I guess a more accurate way to say it was I began—because sometimes people might consider internship an official, you know, on-the-books internship.  But this was a different kind of internship." Tr. at 4:23–5:1.  He went on: "I would go after school sometimes and I would wait in the lobby and work with artists that I met, and I would help out with anything that I could.  And eventually, I was at some point considered, like, an official intern." *Id.* at 5:2–5.  He added: "I was considered an intern, but it wasn't an internship, if that makes sense." *Id.* at 6:20–21.  He could not answer

the question who hired him, and when asked to whom he reported, he stated: "It would be whoever the secretary was at the time, so I was working with the artists." *Id.* at 7:23–24. Plaintiff withdrew his reliance on the Equity Agreement because, in his words, "I cannot authenticate its chain of custody." *Id.* at 31:8; *see also* Dkt. No. 132 at 3 (Plaintiff's statement that he withdrew the Equity Agreement because he could "not personally authenticate" it). But, taking the document on its face, he signed it and possessed it. Dkt. No. 8 at 30. The reason he withdrew it is that he recognized it was a fake.

Plaintiff's withdrawal of the evidence is relevant to the question whether the Court should dismiss his Complaint but it is not dispositive of it. As Judge Pauley put it (echoing Judge Howell), "merely excluding the fabricated evidence would not only fail to address . . . [P]laintiff's other misconduct . . . but would also send the [P]laintiff, and future litigants like [her], the message that they have everything to gain, and nothing to lose, by continuing to submit fabricated evidence." *Lawrence v. City of New York*, 2018 WL 3611963, at *7 (S.D.N.Y. July 27, 2018) (quoting *Slate v. Am. Broad. Cos., Inc.*, 941 F. Supp. 2d 27, 52 (D.D.C. 2013)); *see also Stonecreek - AAA, LLC v. Wells Fargo Bank N.A.*, 2014 WL 12514900, at *3 (S.D. Fla. May 13, 2014) ("It would send a dangerous message to attorneys and parties if I were to allow a party to use fabricated evidence as the basis of its complaint, strike the fabricated evidence and then allow the case to proceed. Such an abuse of the judicial process, and defilement of the judicial temple that is the court, will not be tolerated").

Misconduct is likely to occur in the future. Plaintiff has withdrawn only those documents as to which the evidence is abundantly clear that they are forgeries. Even then, he has done so only grudgingly, on narrow technical grounds that he "could not personally authenticate them under Rule 901; and, consistent with Rule 104(a) and the principles of Rule 611(a), . . . withdrew

them rather than force imperfect or uncertain proof." Dkt. No. 132 at 3–4.  He has not conceded what is overwhelmingly clear—the issue is not one of authentication; the documents cannot be what they purport to be.  There is no assurance that, when the evidence is not as clear, Plaintiff will not continue to resort to submitting fake evidence.  Plaintiff has made no attempt to demonstrate that misconduct will not continue.  *See McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 462 (S.D.N.Y. 2002) (finding that "misconduct will almost certainly continue" where plaintiff "has shown no remorse for her deceptions, offered no apologies for her lies, and never corrected her misstatements").

During his direct testimony, Plaintiff did not respond to Defendants' evidence of fabrication or offer any evidence, other than his own belief, that the documents are legitimate. Tr. 3:10–4:9.  Plaintiff instead continued his misconduct by lying at the hearing, claiming that he was an intern when the evidence is clear that he held no such position.  *Id.* at 4:18–20.  In his supplemental submission filed after the hearing, Plaintiff maintains that his intention in submitting the withdrawn Equity Agreement was for the Court to infer that the promises in the agreement were real and based on his "early work" with Defendants.  Dkt. No. 132 at 4.  In other words, he intended the Court believe the claims of the fabricated document.  Though he now states the Court should not rely on this document, Plaintiff maintains that the Court should infer that the claims reflect his lived experience.  Dkt. No. 132 at 4.  Plaintiff's perpetuation of fraud on the Court is thus ongoing and warrants dismissal.  *See Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 435 (S.D.N.Y. 2016) (dismissing complaint with prejudice for fraud on the court where "misconduct was part of an extended and troubling pattern of fabrications and denials"); *Colella*, 2020 WL 4700930, at *8 ("[B]ecause Plaintiffs have repeatedly doubled down on their fraudulent conduct, . . . the relevant misconduct is not cabined

9

to an isolated instance.  As a consequence, the severe sanction of vacatur and dismissal is justifiable." (internal quotation marks and citation omitted)).

Moreover, as Plaintiff's own Complaint makes clear, the withdrawn documents were not merely incidental to his claim.  They formed the foundation for that claim.  In the absence of the documents all that remains is the fantastical notion that as a fifteen-year-old, Plaintiff invented and registered the Domain Name and was given an oral option agreement to purchase two percent of Universal Music Group.  As the misconduct at issue "is the knowing fabrication of the critical allegations underlying the complaint . . . it would be pointless to allow the case to proceed."  *Almeciga*, 185 F. Supp. 3d at 435; *see also id.* ("Dismissal is virtually required under such circumstances."); *Skywark*, 1999 WL 1489038, at *15 (considering both whether misconduct is repeated and whether misconduct "was central to the case" in determining whether to dismiss complaint for fraud on the court).

## CONCLUSION

The Complaint is dismissed with prejudice.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: January 5, 2026
      New York, New York

                                 LEWIS J. LIMAN
                           United States District Judge